# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

**BRIAN ANDRE RILEY**                    **CIV. ACTION NO. 3:21-00750**

**VERSUS**                               **JUDGE TERRY A. DOUGHTY**

**KILOLO KIJAKAZI, ACTING**              **MAG. JUDGE KAYLA D. MCCLUSKY**
**COMMISSIONER, U.S. SOCIAL**
**SECURITY ADMINISTRATION**

### REPORT AND RECOMMENDATION

Before the court is Plaintiff' petition for review of the Commissioner's denial of social security disability benefits. The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons assigned below, it is recommended that the decision of the Commissioner be **REVERSED and REMANDED for further proceedings.**

### Background & Procedural History

Brian Riley filed the instant application for Title II disability insurance benefits on January 9, 2017. *See* Tr. 296, 439-445). Riley, who was 57 years old at the time of the second administrative hearing, asserted a disability onset date of December 19, 2016, because of major depressive disorder. *See* Tr. 253, 497, 501. The state agency denied the claim initially on April 13, 2017. (Tr. 279-292, 315-318). Thereafter, Riley requested and received a July 9, 2018 hearing before an Administrative Law Judge ("ALJ"). (Tr. 250-278). In a November 8, 2018 written decision, the ALJ determined that Riley was not disabled under the Social Security Act, finding at step five of the sequential evaluation process that he was able to make an adjustment to work that exists in significant numbers in the national economy. (Tr. 293-306). Riley petitioned the Appeals Council to review the unfavorable decision. On December 20, 2019, the

Appeals Council granted the request for review, vacated the ALJ decision, and remanded the case for further proceedings, with instructions, *inter alia*, to obtain evidence from a psychiatrist or other medical expert to help determine the nature and severity of Riley's functional limitations from his impairments.  (Tr. 311-314).

Pursuant to the remand order, the same ALJ held a second administrative hearing on June 1, 2020.  (Tr. 227-248).  However, in a July 2, 2020 written decision, the ALJ again determined that Riley was not disabled under the Social Security Act, finding at step five of the sequential evaluation process that he was able to make an adjustment to work that exists in significant numbers in the national economy.  (Tr. 10-25).  Riley appealed the adverse decision to the Appeals Council.  On January 21, 2021, however, the Appeals Council denied Riley's request for review; thus, the ALJ's decision became the final decision of the Commissioner.  (Tr. 1-3).

On March 22, 2021, Riley filed the instant complaint for judicial review of the Commissioner's final decision.  Following submission of the administrative transcript and supporting memoranda, the matter is now before the court.

### **Standard of Review**

This court's standard of review is (1) whether the final decision is supported by substantial evidence, and (2) whether the Commissioner applied the proper legal standards to evaluate the evidence.  *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021) (citation omitted).  The Supreme Court has emphasized that

> [t]he phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding.  Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations.  And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla."  It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."

*Biestek v. Berryhill*, ___ U.S.___, 139 S.Ct. 1148, 1154 (2019) (internal citations omitted).  The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

Upon finding substantial evidence, the court may only review whether the Commissioner has applied proper legal standards and conducted the proceedings consistently with the statute and regulations.  *Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983).  In other words, where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed – *unless* the Commissioner applied an incorrect legal standard that materially influenced the decision.  *See* 42 U.S.C. § 405; *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000); *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

## Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability.  *See* 42 U.S.C. § 423(a)(1)(D).  The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . ." 42 U.S.C. § 423(d)(1)(A).  A disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).  Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work.  *See* 42 U.S.C. §

423(d)(2)(A).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA. *See* 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows,

(1)     An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)     An individual will be found not disabled if he or she does not have a "severe impairment," or a combination of impairments that is severe, and of the requisite duration.

(3)     An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1], and meets the duration requirement, will be considered disabled without the consideration of vocational factors.

        Before proceeding to step four, the Commissioner assesses the individual's residual functional capacity, which is used at both step four and step five to evaluate the claim.

(4)     If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

(5)     If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy. If the individual can make such an adjustment, then he or she will be found not disabled. If the individual is unable to adjust to other work, then he or she will be found disabled.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920.

When a finding of "disabled" or "not disabled" may be made at any step, a decision will be rendered at that point without proceeding to the remaining steps. 20 C.F.R. §§ 404.1520, 416.920; *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). "The claimant bears

the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step." *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018) (citation omitted).

<u>**The ALJ's Findings**</u>

## I.    Steps One, Two, and Three

After affording the claimant "the greatest benefit" of the doubt, the ALJ determined at step one of the sequential evaluation process that the claimant did not engage in substantial gainful activity during the relevant period.  (Tr. 16).  At step two, he found that the claimant suffered severe impairments of depressive disorder and anxiety disorder.  (Tr. 16-17).[1]  He concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process.  (Tr. 17-18).

## II.    Residual Functional Capacity

The ALJ next determined that the claimant retained the residual functional capacity ("RFC") "to perform a full range of work at all exertional levels but is limited to simple 1,2,3 step instructions and only occasional interaction with the public."  (Tr. 18-24).

## III.    Steps Four and Five

With the assistance of a vocational expert ("VE") the ALJ determined at step four of the sequential evaluation process that the claimant was unable to return to past relevant work.  (Tr. 24).  Accordingly, he proceeded to step five.  At this step, the ALJ determined that the claimant was an individual closely approaching advanced age on the alleged disability onset date and had

---

[1] The ALJ further determined that the claimant's medically determinable impairments of hypertension, arthritis, and obesity were not severe.  *Id*.

at least a high school education. *Id.* Transferability of skills was not material to the decision. *Id.*

The ALJ next observed that given the claimant's vocational factors, and if he had an RFC that did not include any non-exertional limitations, then the Medical-Vocational Guidelines would direct a finding of not disabled. 20 C.F.R. §§ 404.1569, 416.969; Rule 204.00, Appendix 2, Subpart P, Regulations No. 4; Tr. 24-25. However, because the claimant's RFC *did* include non-exertional limitations, the ALJ consulted a VE to determine whether, and to what extent the additional limitations eroded the occupational base for work. *Id.* In response, the VE identified the representative jobs of **housekeeping cleaner**, *Dictionary of Occupational Titles* ("DOT") Code # 323.687-014; and **kitchen helper/dishwasher**, DOT # 318.687-010. (Tr. 24-25, 246-247).[2]

### <u>Non-Exhaustive Chronology of Potentially Relevant Medical Evidence</u>

Benjamin Felbel, M.D.'s progress notes from July 18, 2016, indicate that Riley's wife had thrown hot water on him. (Tr. 591-592). He had second degree burns on most of his chest, shoulders, and parts of the anterior arms and superior abdomen. *Id.* He was treated with Silvadene, kerlex, and ACE wrap, and provided a note for no work for one week. *Id.*

Riley saw Carolos Hernandez, PA, on December 29, 2016, for complaints of depression and sleep problems. (Tr. 614-617). Riley expressed suicidal ideation by using a gun. *Id.* He stated that he had pointed a gun to his mouth in the past, but was unclear how recent that was.

---

[2] The VE responded that for the housekeeping cleaner and kitchen helper/dishwasher jobs there were 237,448 and 554,402 positions available nationwide, respectively. (Tr. 246-247). This incidence of work constitutes a significant number (and range) of jobs in the "national economy." 42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

*Id.* Hernandez stated that they would proceed with a PEC (Physician's Emergency Certificate) and have Riley sent to the emergency room via ambulance. *Id.*

Riley was admitted to Glenwood Regional Hospital from December 29, 2016, until January 4, 2017, with diagnoses of major depression with psychosis, severe, recurrent; alcohol dependence; and posttraumatic stress disorder. (Tr. 596-600). His stressors included the death of his mother and separation from his mentally ill wife. *Id.* He had a Global Assessment of Functioning score ("GAF") of 50.[3] *Id.* He was admitted due to increased depression and recurrent thoughts of suicide. *Id.* He had nightmares about his mother dying and heard her voice. *Id.* He has been drinking heavily for the past six months. *Id.* He was separated from his wife of three years, and there were charges pending against her. *Id.* He drank alcohol on and off at least once or twice per week. *Id.* His medical problems included hypertension, obesity, edema, and gout. *Id.*

Rita Agarwal, M.D., examined Riley on December 30, 2016. (Tr. 601-602). Riley reported that he had been drinking heavily for the past six months, but for the past month had been taking one brandy per day. *Id.* He worked full time. *Id.* He was thinking about hurting himself and that was why he was at the hospital. *Id.* His wife had a bipolar disorder and had been off her medication when she threw scalding water on him. *Id.* She bonded out of jail, and they had resumed living together. *Id.* He reported that he had been to a psychiatric hospital a few years previously when his first wife left him and took everything. *Id.* He was very

---

3 "GAF is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'" *Boyd*, 239 F.3d at 701 n.2 (citing AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32 (4th ed. 1994) (DSM-IV)). A GAF of 41-50 denotes "**[s]erious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)." DSM-IV, pg. 32.

emotional.  *Id.*  His insight and judgment were impaired.  *Id.*  Agarwal diagnosed major depression without psychosis, recurrent; and alcohol dependence.  *Id.*  She assigned a GAF of 25.[4]  *Id.*

Dr. Agarwal evaluated Riley again on January 3, 2017.  (Tr. 604).  Riley continued to be very anxious and depressed, with panic attacks.  *Id.*  He heard voices and was unable to concentrate.  *Id.*  He heard his deceased mother tell him that everything was going to be okay.  *Id.*  He was quiet, distant.  *Id.*  His affect was flat; his sleep was poor.  *Id.*  His insight and judgment were impaired; memory was fair.  *Id.*  Agarwal diagnosed major depression with psychosis and PTSD.  *Id.*  She increased his medication.  *Id.*

Riley saw Carolos Hernandez, PA, on January 11, 2017, for follow-up after his six-day hospitalization for depression and anxiety.  (Tr. 611-613).  He reported that the experience was positive overall.  *Id.*  He had been doing well on his new medication.  *Id.*  His symptoms of profound sadness had been ongoing for several years.  *Id.*  He no longer had suicidal ideation, however.  *Id.*  He also reported a history of ETOH abuse, but had not used ETOH recently.  *Id.*  Hernandez diagnosed depressive disorder, PTSD, and anxiety.  *Id.*

Riley saw Dr. Agarwal on March 27, 2017, for a psychiatric evaluation.  (Tr. 843-844).  He had a GAF of 45.  *Id.*

Riley returned to Dr. Agarwal on April 1, 2017.  (Tr. 841-842).  He had nightmares at night and could not sleep.  *Id.*  He still heard his mother's voice and drank sometimes.  *Id.*

At the request of the state agency, Riley underwent an April 3, 2017 mental clinical

---

[4] A GAF of 21-30 is defined as "**[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment** (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to function in almost all areas** (e.g., largely incoherent or mute)."  DSM-IV, pg. 32.

interview with Aletha Nelson, LPC. (Tr. 662-666). Riley had noticeable trouble walking and used a cane. *Id.* Riley's wife drove him to the interview. *Id.* He reported that he was "depressed, sad, and not sleeping." *Id.* He still was grieving the loss of his mother who had passed away in August 2014. *Id.* He has nightmares about her death and heard her voice at night. *Id.* He reported unexplained bouts of crying outbursts. *Id.* He admitted to heavy drinking about nine months previously that had lasted for about six months, which he attributed to self-medication. *Id.* He reported four to five hours of sleep per night. *Id.* He had no desire to do anything and had thoughts of wanting to harm himself. *Id.* He had been arrested on February 15 for speeding. *Id.* He reported that he was unable to concentrate or focus for any length of time. *Id.* His mind wandered and it was difficult to maintain attention. *Id.* He reported minimal alcohol use at that time. *Id.* Because of his depression, he was unable to work. *Id.*

Nelson noted that Riley was obsessed about his depression and his inability to function. *Id.* His mood was somewhat depressed, and his affect was flat. *Id.* His memory was intact; judgment and insight were adequate. *Id.* He was mildly distractable. *Id.* Nelson stated that Riley's social interactions were greatly limited by his depression. *Id.* His prognosis appeared to be adequate. *Id.* His ability to sustain effort and persist at a normal pace over a 40-hour workweek was diminished because of symptoms of depression, anxiety, and gout. *Id.* He was unable to tolerate or adapt to the stress and demands of an ordinary work environment. *Id.* However, he was able to relate to authority figures in non-confrontational situations. *Id.* Moreover, he was able to follow directions during the examination with no difficulty. *Id.*

Riley returned to Dr. Agarwal on April 12, 2017. (Tr. 839-840). He was not sleeping well and still was hearing voices. *Id.* He was positive for nightmares and drinking two cups of whiskey per day. *Id.* His mood was depressed and anxious. *Id.* He had auditory and visual

9

hallucinations, but his memory remained intact. *Id.* His insight and judgment were fair. *Id.*

On April 10, 2017, non-examining agency psychologist, James Pinkston, Ph.D., reviewed the record and opined that Riley was moderately limited in his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace. (Tr. 287-289). Pinkston explained that Riley could sustain attention for up to 2-hour blocks of time when performing simple and routine work-related tasks, follow simple work-like procedures, and make simple work-related decisions. *Id.* He also would not require inordinate supervision when performing these tasks. *Id.* His symptoms would not prevent sustaining mental demands associated with performance of simple, routine tasks throughout an ordinary workday/workweek. *Id.*

Pinkston further opined that Riley was moderately limited in his ability to interact with others such that he would have significant difficulty dealing effectively with the demands of the general public, but could relate to the public on a limited basis and coworkers and supervisors in non-confrontational situations. *Id.* He could accept respectful supervision and constructive criticism. *Id.* He could independently maintain appropriate hygiene and dress. *Id.*

Finally, Pinkston stated that Riley was moderately limited in his ability to respond appropriately to changes in the work setting. (Tr. 288). He would function best in a standardized work environment with minimal variation. *Id.* He could make adjustments and avoid hazards in a work environment with minimal variation. *Id.*

On April 13, 2017, non-examining agency physician, Johnny B. Craig, M.D., reviewed the record and opined that Riley had no severe physical impairments. (Tr. 283-284).

Dr. Agarwal wrote a to whom it may concern letter dated May 20, 2017, wherein she

stated that Riley had been in her care since December 30, 2016, and had been unable to work since that date. (Tr. 668). She added that he continued to be very depressed and remained unable to hold any kind of job currently. *Id.*

Riley again was hospitalized from May 29 to June 3, 2017, at LSU-E. A. Conway Hospital. (Tr. 693-759). He was brought to the hospital by a sheriff's deputy and his cousin for suicidal behavior. *Id.* His cousin reported that he had taken a .38 pistol, a meat cleaver, and a pair of scissors away from Riley. *Id.* Riley was non-compliant with his medications and drank heavily every day. *Id.* He had a history of PTSD, schizophrenia, and depression. *Id.* He consumed 21 shots of liquor per week. *Id.* He was positive for agitation, hallucinations, and suicidal ideation. *Id.* He admitted to a half-gallon of brandy consumption, daily. *Id.* His mood was sad and tearful, with outbursts of crying then laughing. *Id.* Riley reported that his wife had left him recently and that he had been drinking for the past week. *Id.* He had been hearing voices that told him to harm himself. (Tr. 702). He was admitted to ICU for management of alcohol overdose and withdrawal. *Id.* Once medically cleared, Riley required inpatient psychiatric admission to dual diagnosis facility for stabilization of mood, psychosis, and substance abuse. (Tr. 713). He was counseled on abstaining from alcohol/drugs. *Id.* Riley admitted that he had been using alcohol on a daily basis for "quite a while." (Tr. 742).

On June 3, 2017, Riley was discharged to Conway psychiatric unit, where he remained until June 7, 2017. (Tr. 759). Upon discharge, he was stable with diagnoses for major depressive disorder, recurrent, severe with psychotic symptoms; alcohol abuse, uncomplicated; and PTSD. (Tr. 786-831). Riley disputed that he had threatened himself. *Id.* He explained that he did not have a meat cleaver; rather, he had a bottle opener for the beer. *Id.* He reported daily drinking of whiskey. *Id.* He had been out of his medications for one week. *Id.* He admitted to

previous audiovisual hallucinations of his mother. *Id.* He denied suicidal or homicidal ideation. *Id.* Riley got along well with his peers and unit staff. *Id.* His mood, mental status, and behavior were appropriate and much improved. *Id.* He no longer was a danger to himself or others. *Id.* He was discharged to home with his cousin. *Id.*

On June 21, 2017, Riley followed up with Mamdouh Mickail, M.D., after his hospital stay at Conway. (Tr. 878-881). He had no anxiety, hallucinations, sleep disturbances, suicidal thoughts, or depression. *Id.*

Riley saw Monetta Givens, LPC, on August 4, 2017. (Tr. 685-691). Riley reported nightmares regarding his mother's death and his wife burning him. *Id.* He endorsed audiovisual hallucinations and had conversations with his dead mother two to three times per week. *Id.* He also has flashbacks of her death and his own assault. *Id.* He was diagnosed with major depressive disorder, recurrent, severe, with psychotic features; and alcohol use disorder, severe. *Id.*

Riley saw Heather Davis, NP, on May 1, 2018, for back and knee pain. (Tr. 1046-1049). He had extremity paresthesia and numbness. *Id.*

On September 13, 2018, Riley saw Claire Bradley, M.D., for medication refill. (Tr. 943-946). He reported abuse by his wife. *Id.* However, she had called the police, which had resulted in his arrest and detention for 18 days. *Id.* He had started part-time work one week earlier. *Id.* He planned to continue living with relatives until he found his own place. *Id.*

On October 2, 2018, Riley presented to Dr. Bradley for medication refill. (Tr. 939-942). He reported that he had "ups and downs," but things had been settling down. *Id.* He acknowledged improved mood and sleep after getting a new job. *Id.* He felt upbeat and motivated. *Id.* He noted continued stress related to his wife and legal issues. *Id.* However, he

worked five days per week from 3 p.m. to 7 p.m., and then 9:00 to 12:30. *Id.* He slept from 2-3 a.m. until 1 to 2 p.m. *Id.* He met with his counselor twice per week, which was helpful. *Id.* Riley planned to live with his cousin but intended to look for his own place. *Id.* His concentration, judgment, and insight all were intact. *Id.* Bradley diagnosed major depressive disorder, PTSD, and partner relationship problems. *Id.*

On February 27, 2020, Riley underwent a consultative psychological examination with David Williams, Ph.D. (Tr. 1008-1015). As part of his report, Williams reviewed records, obtained a psychosocial history, and administered a mental status examination. *Id.* Williams noted that Riley's depression had started several years earlier with his mother's passing. *Id.* The anxiety had started together with the depression, and symptoms included nervousness and paranoia when he was in crowds. *Id.* He worried that people were staring at him or that something would happen to him. *Id.* He explained that he was a loner. *Id.* His last panic attack had been the other day, which made him angry because it had prevented him from doing what he needed to do. *Id.* The attack had been triggered when someone said something to him. *Id.* The attacks occurred a couple of times per week. *Id.* He worried about everything. *Id.* His depression, anxiety, and panic attacks had worsened. *Id.*

When Riley had been in North Carolina, he had heard a voice in his head. *Id.* Sometimes, it sounded like it came from outside of his head. *Id.* The voices gave him words of encouragement. *Id.* He also saw blurry visions at night, a few times per week. *Id.* Williams noted that Riley's auditory hallucinations were highly atypical as hallucinations normally are pejorative and usually never encouraging. *Id.* There were no reports of mania. *Id.* Riley vividly recalled his mother's reaction right before she died. *Id.* He had flashbacks all of the time. *Id.* He worried that people could harm him and had problems trusting others. *Id.* He did not

describe psychotic paranoia. *Id.* His sleep was poor. *Id.* He averaged four to five hours per night. *Id.* His appetite was poor, and he barely ate. *Id.* He was separated from his wife. *Id.* He stated that his mental health symptoms had limited his job performance because he was "all over the place." *Id.* He had a routine, and he worked by himself. *Id.* He explained that it was a simple job, but it appeared more difficult for him every day. *Id.* He had a history of legal problems secondary to his mental health problems. *Id.* Riley reported four psychiatric hospitalizations and three suicide attempts. *Id.* He was more stable now and was seeing someone for follow-up. *Id.* There was no history of self-harm, but there was a history of problematic aggression and rage. *Id.* He had had a short temper in the past. *Id.*

Riley never engaged in social activities, and only had a few friends. *Id.* He was employed part-time at an assisted living facility. *Id.* He had a history of two jobs over the past three-years, and had been fired from a job for misreading the schedule. *Id.* Otherwise, there was no significant discipline history while on the job. *Id.* He had no impairment in his activities of daily living, but was unsure if he could live independently. *Id.*

Williams noted that Riley was cooperative, with a depressed mood. *Id.* He broke down on several occasions during the interview. *Id.* Delayed memory was poor. *Id.* Overall, Riley was able to interact appropriately on a 1:1 basis. *Id.* Social judgment was adequate. *Id.* Concentration was adequate; pace was moderately limited, and persistence was mildly limited. *Id.* Dr. Williams opined that Riley's ability to understand and carry out instructions was not limited. *Id.* Immediate and long-term memory were grossly intact. *Id.* Concentration was intact. *Id.* Pace was moderately limited, and persistence was mildly limited. *Id.* Social functioning was moderately limited. *Id.* He was able to demonstrate adequate social skills, but was withdrawn and had a hot temper which had resulted in physical aggression towards others.

14

*Id.* Adaptation was moderately limited. *Id.* Prognosis was guarded to poor without mental health treatment, but fair with treatment. *Id.*

Williams also completed a medical source statement of ability to do work-related activities (mental). (Tr. 1017-1019). He indicated no more than mild impairment in Riley's ability to remember and carry out instructions. *Id.* However, he opined that Riley was markedly limited in his ability to interact appropriately with the public, supervisors and coworkers. *Id.* He also was moderately limited in his ability to respond appropriately to usual work situations and to changes in a routine work setting. *Id.* Williams explained that Riley had a brittle affect and had trouble regulating emotions in response to the pressures associated with the mental status evaluation. *Id.* Work pace was moderately limited. *Id.* Persistence was mildly limited. *Id.* Williams noted that Riley's symptoms had worsened when he moved back to Louisiana. *Id.* Substance use was not impairing functioning. *Id.*

<u>**Analysis**</u>

Riley sets forth three assignments of error:

1.      **The ALJ committed reversible legal error by not complying with applicable authority concerning the role of Mr. Riley's alcohol use;**

2.      **The ALJ's RFC assessment is not supported by substantial evidence; and**

3.      **The ALJ failed to properly consider Mr. Riley's subjective complaints and testimony.**

The court will address the arguments in order.

**I.      DAA Materiality Findings/References**

Riley contends that the ALJ erred in his decision by repeatedly commenting on the effects of his impairments when he was abstinent from ethyl alcohol, without first finding that he was disabled *with* consideration of the effects of his alcohol use. For example, the ALJ stated

15

that "when the clamant is medication compliant *and ethyl alcohol abstinent*, mood is generally normal/good, thoughts are unremarkable, and memory is normal."  (Tr. 19) (emphasis added). Further, "[w]hile the claimant previously testified to ongoing hallucinations, the medical evidence of record shows that when the claimant is medication compliant and *ethyl abstinent*, he has no psychosis."  (Tr. 22) (emphasis added).  Finally, the ALJ seemingly endeavored to discount Dr. Agarwal's May 20, 2017 letter on the basis that she failed to include ethyl alcohol dependence as one of his impairments.  *See* Tr. 23.

Under the Social Security Act, an individual will not be considered disabled for purposes of disability insurance benefits if alcoholism or drug addiction was a contributing factor material to the Commissioner's determination that the individual is disabled.  42 U.S.C. § 423(d)(2)(C). The Commissioner follows the usual case development rules and procedures for any impairment in cases in which drug addiction and alcoholism ("DAA") is or may be an issue.  *Social Security Ruling, SSR 13-2p.; Titles II and XVI: Evaluating Cases Involving Drug Addiction and Alcoholism (DAA)* ("SSR 13-2p").

However, before determining whether DAA is a contributing factor material to the determination of disability, the Commissioner first must find that the claimant is disabled.  20 C.F.R. § 404.1535(a); *see also Halterman v. Astrue*, Civ. Action No. 08-0004, 2009 WL 463889, at *6–7 (W.D. La. Jan. 30, 2009) (before considering whether DAA is a contributing material factor, there must first be a finding of disability).  Indeed, pursuant to the SSA's Program Operations Manual System ("POMS"), an adjudicator only will make a DAA materiality

determination when, *inter alia*, he has determined that the claimant otherwise is disabled, considering all impairments, including DAA.  (POMS, DI 90070.050).[5]

Here, of course, the ALJ made no such antecedent finding.  Accordingly, his emphasis upon the effects of Riley's impairments, absent DAA, is unorthodox and potentially prejudicial. Some district courts have found reversible error under these circumstances, whereas others have found the error harmless.  *See, e.g., Oettinger v. Barnhart*, Civ. Action No. 01-0801, 2002 WL 31422308, at *7 (W.D. Tex. Sept. 4, 2002) (reversible error); *Campanile v. Astrue*, Civ. Action No. 10-0716, 2012 WL 1424728, at *4 (M.D. La. Mar. 19, 2012), *R&R adopted,* 2012 WL 1430958 (M.D. La. Apr. 24, 2012) (ALJ applied incorrect legal criteria warranting reversal); *Anderson v. Colvin*, Civ. Action No. 12-1039, 2013 WL 4774638, at *4 (N.D. Tex. Sept. 6, 2013) (plaintiff failed to demonstrate that his substantial rights were prejudiced by the ALJ's evaluation of his DAA).

This court need not resolve whether the ALJ's handling of the DAA issue in this case materially impacted his decision because reversal is warranted on another basis.  *See* discussion, *infra*.  Upon remand, the ALJ will have the opportunity to conform his DAA analysis to SSA policy.

---

[5] "POMS are not binding on the Commissioner, but they may be viewed as binding on an ALJ in a case that falls squarely within one of the provisions."  *Taylor v. Saul*, Civ. Action No. 18-0765, 2019 WL 4667515, at *4 (N.D. Tex. Sept. 25, 2019) (citation omitted).  Furthermore, the Fifth Circuit has recognized that "where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required." *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000) (quoting *Hall v. Schweiker,* 660 F.2d 116, 119 (5th Cir. 1981)).

II.    **RFC**

Riley contends that, for various reasons, the ALJ's RFC, which included limitations stemming solely from his mental impairments, is not supported by substantial evidence.  The court agrees.

First, in his application of the psychiatric review technique ("PRT"), the ALJ found that Riley had moderate limitations in all four domains of functioning:  understanding, remembering or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.[6]  (Tr. 17-18).  In his current RFC, the ALJ adopted limitations only for "simple 1,2,3 step instructions and . . . occasional interaction with the public."  (Tr. 18-24).

In the RFC from his 2018 decision, the ALJ stated that Riley was "precluded from complex work and can only occasionally interact with the public."  (Tr. 300).  In reversing the ALJ's 2018 decision, the Appeals Council found that the prior RFC failed to "contain any limitations that would account for the moderate limitation in adapting and managing oneself."

---

[6] Perhaps the least intuitive of the four domains, the "adapt or manage oneself" area of mental functioning refers to

> the abilities to regulate emotions, control behavior, and maintain well-being in a work setting. Examples include: Responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions . . .

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Rule 12.00E4.

18

(Tr. 313).  It is not self-evident to this court that the current limitation to "simple 1, 2, 3 step instructions," contemplates a moderate limitation in the domain of adapting and managing oneself.[7]

Second, Riley contends that the ALJ erred by adopting a limitation to only "occasional interaction with the public," without incorporating any limitation regarding his interaction with supervisors and co-workers.  Consultative psychologist, Dr. Williams, indicated that Riley was markedly limited in his ability to interact appropriately with the public, supervisors and coworkers.  (Tr. 1017-1019).  Also, consultative LPC, Aletha Nelson, stated that Riley's social interactions were greatly limited by his depression.  (Tr. 662-666).  Furthermore, he was able to relate to authority figures in non-confrontational situations.  *Id.*  Similarly, non-examining agency psychologist, James Pinkston, Ph.D., opined in 2017 that Riley was moderately limited in his ability to interact with others such that he would have significant difficulty dealing effectively with the demands of the general public, but could relate to the public on a limited basis and coworkers and supervisors in non-confrontational situations. (Tr. 287-289).  He also could accept respectful supervision and constructive criticism.  *Id.*

In his resolution of the opinion evidence, the ALJ assigned "great weight" to Dr. Pinkston's opinion, "little weight" to LPC Nelson's opinion, and "partial weight," to Dr. Williams' findings.  (Tr. 22-23).[8]  However, it is axiomatic that, for claims filed prior to March

---

[7] Riley further argues that the ALJ also failed to account in his RFC for his PRT finding that Riley had moderate limitation in the domain of understanding, remembering, and applying information.  However, a limitation to "simple 1, 2, 3 step instructions," would seem to sufficiently address the limitation in this area.

[8] The ALJ further assigned "little weight" to Dr. Agarwal's statement that Riley was unable to work.  (Tr. 23).  Of course, a physician's statement that a claimant is "disabled" or "unable to

27, 2017, "an ALJ may properly rely on a non-examining physician's assessment when . . . those findings are based upon a careful evaluation of the medical evidence and *do not contradict those of the examining physician*." *Carrier v. Sullivan*, 944 F.2d 243, 246 (5th Cir. 1991) (quoting, *Villa v. Sullivan*, 895 F.2d 1019,1024 (5th Cir. 1990)) (emphasis added).[9]   Therefore, the ALJ was not permitted to rely on the opinion of the non-examining psychologist where it conflicted with that of the examining psychologist/counselor.

Furthermore, the ALJ did not include all of the limitations recognized by Dr. Pinkston. For example, he did not include a limitation to non-confrontational situations for Riley's interactions with coworkers and supervisors, or his need for respectful supervision and constructive criticism. (Tr. 287-289).[10]  "[A]n inability to appropriately interact with or respond to criticism from supervisors is distinct from an inability to interact with either coworkers or the public." *Melissa R. v. Berryhill*, Civ. Action No. 17-7716, 2018 WL 6507898, at *4 (C.D. Cal. Dec. 11, 2018) (citations omitted).  In other words, "[t]he public, supervisors, and co-workers are distinct groups, and are separately addressed on the mental RFC forms.  Thus, limitations on one

---

work" is not accorded *any* special significance under the regulations.  *See* 20 C.F.R. § 404.1527(d)(1)-(3) (for claims filed before March 27, 2017); *Frank v. Barnhart*, 326 F.3d 618 (5th Cir. 2003).

[9]  Also, a non-examining physician/psychologist's opinion does not provide good cause for an ALJ to discount the findings of an examining physician.  *See Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988) (addressing ALJ's reliance upon non-examining physician's opinion to discount findings of treating physician). The Fifth Circuit cited *Lamb* for the proposition that the reports of non-examining physicians do not provide substantial evidence when the non-examining physician's medical conclusions "contradict or are unsupported by findings made by an examining physician." *Villa, supra* (citing, *Lamb, supra*; and *Strickland v. Harris*, 615 F.2d 1103, 1109-10 (5th Cir. 1980)).

[10]  In addition, the ALJ did not incorporate Dr. Pinkston's limitation that Riley would function best in a standardized work environment with minimal variation.  (Tr. 288).

type of interaction in the RFC does not account for limitations on the others." *Peggy C. v. Kijakazi*, Civ. Action No. 19-17472, 2021 WL 3206812, at \*6 (D.N.J. July 29, 2021) (citations omitted). Consequently, where an ALJ finds that the claimant is "moderately limited in interacting with others," his unexplained decision to omit a limitation relating to interaction with supervisors (and co-workers) cannot be excused as harmless error. *Peggy C., supra*.

To be sure, the ALJ is not obliged to tether his RFC to a particular medical source statement, so long as the record otherwise contains substantial evidence to support the RFC. Here, it appears that the ALJ endeavored to support his occasional interaction with the public limitation upon evidence that Riley lived with others, spent time with family, and was able to work since the alleged onset date. However, Riley alternately lived with his estranged wife and his cousin, but the former poured scalding water on him and had him arrested, whereas the latter had him involuntarily committed to a facility. Furthermore, Riley's relatives only visited him for five to ten minutes at a time because they knew how uncomfortable he was around others. (Tr. 272). In addition, Riley testified that he basically worked alone at both of his post-alleged-onset-of-disability jobs as a cook and janitor. (Tr. 241-242).

Citing Social Security Rule 85-15,[11] the Commissioner contends that the unskilled jobs, like the ones the ALJ found that the Riley could perform, consist mainly of dealing with objects, rather than people. (Comm.'r Brief, pgs. 9-10). In other words, the Commissioner seems to suggest that the ability to perform unskilled work accommodates even greater social limitations

---

[11] TITLES II & XVI: CAPABILITY TO DO OTHER WORK-THE MEDICAL-VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING SOLELY NONEXERTIONAL IMPAIRMENTS (SSR 85-15) (1985).

than what the ALJ endorsed in his RFC. However, the Commissioner omitted other pertinent

sections of SSR 85-15, for example,

> [w]here a person's only impairment is mental, is not of listing severity, but does prevent the person from meeting the mental demands of past relevant work and prevents the transferability of acquired work skills, the final consideration is whether the person can be expected to perform unskilled work. The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; *to respond appropriately to supervision, coworkers, and usual work situations*; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

> \*     \*     \*

> Because response to the demands of work is highly individualized, *the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job*. A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job. [F]or example, a busboy need only clear dishes from tables. But an individual with a severe mental disorder may find unmanageable the demands of making sure that he removes all the dishes, does not drop them, and gets the table cleared promptly for the waiter or waitress. Similarly, an individual who cannot tolerate being supervised may not be able to work even in the absence of close supervision; the *knowledge* that one's work is being judged and evaluated, even when the supervision is remote or indirect, can be intolerable for some mentally impaired persons. *Any impairment-related limitations created by an individual's response to demands of work, however, must be reflected in the RFC assessment.*

(SSR 85-15) (emphasis added).[12]

In sum, the court is constrained to find that the ALJ's residual functional capacity

assessment is not supported by substantial evidence. *See Simmons v. Colvin*, Civ. Action No. 15-

---

[12] Although social security rulings are not binding on the federal courts, *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001), they are "binding on all components of the Social Security Administration." 20 C.F.R. § 402.35(b)(1).

1673, 2016 WL 4384366, at *9 (W.D. La. May 31, 2016), *R&R adopted,* 2016 WL 4384783 (W.D. La. Aug. 16, 2016) (ALJ's RFC not supported by substantial evidence where the non-examining psychologists indicated, *inter alia*, that the claimant's interaction with co-workers and supervisors was limited to non-confrontational situations, with respectful supervision and constructive criticism, but the RFC failed to include any limitations relating to supervisors).[13]

## III.    Step Five and Remand

Because the foundation for the ALJ's step five determination was premised upon an RFC that is not supported by substantial evidence, the court further finds that the Commissioner's ultimate conclusion that Riley is not disabled, likewise is not supported by substantial evidence.[14]

Riley urges the court not only to reverse the Commissioner's decision but to remand with instructions to award benefits.  The courts enjoy the authority to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  42 U.S.C. § 405(g).  When reversal is warranted, the matter is remanded with instructions to make an award only if the record enables the court to conclusively determine that the claimant is entitled to benefits.  *See Ferguson v. Heckler*, 750 F.2d 503, 505 (5th Cir. 1985); *see also Rini v. Harris*, 615 F.2d 625, 627 (5th Cir. 1980) (reversing and remanding with direction to enter

---

[13]  The court further observes that Riley supplemented the record before the Appeals Council with additional hospitalization and treatment records that predate the ALJ's decision.  *See* Tr. 33-205.  The ALJ will be able to address the effect of this evidence upon remand.

[14] The court need not reach Riley's remaining assignment(s) of error.

judgment where the evidence was not substantial, and the record clearly showed the claimant's right to benefits).

The instant record is not so disposed.  Riley's residual functional capacity assessment remains indeterminate.  Furthermore, even with a more restrictive RFC that incorporates additional limitations of functioning as recognized by the examining psychologist and counselor, Riley still may be able to make an adjustment to work that exists in substantial numbers in the national economy.

<u>**Conclusion**</u>

For the foregoing reasons,

IT IS RECOMMENDED that the Commissioner's decision be REVERSED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent herewith.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party=s objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before a final ruling issues.

**A PARTY's FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL**

**FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 29th day of August, 2022.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE

25